* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff-employee until approximately October 1, 2003.
3. The carrier liable on the risk is correctly named above.
4. Plaintiff's average weekly wage will be determined from an Industrial Commission Form 22 Wage Chart, with supporting wage documentation provided by defendants.
5. The parties agree that plaintiff sustained an exposure arising out of and in the course of her employment with defendant-employer as documented in the report of Dr. Bruce A. Dalton, M.D., dated October 30, 2002. As to further benefits, defendants contend that plaintiff may have exposed herself to causes and/or conditions outside of the employment and, therefore, defendants dispute that plaintiff was last injuriously exposed to such causes and/or conditions while working at its store, and more significantly, dispute the degree to which plaintiff contends that she is disabled. Plaintiff contends the exposure occurred while she was employed by defendant-employer and has resulted in disability.
6. Plaintiff's initial claim of illness was accepted as compensable. Defendants contend it was a medical only claim with minor medical care. Plaintiff contends the exposure resulted in significant medical treatment as well as lost time. The current dispute relates to ongoing disability and the need for additional medical treatment as a result of the compensable claim.
7. Plaintiff returned to work with another employer, Staples, on January 5, 2004. The parties agreed at the hearing that plaintiff's average weekly wage with Staples will be based upon documentation provided by Staples showing wage earnings from the date plaintiff was first employed to the present.
8. At and subsequent to the hearing, the parties submitted a Packet of Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (2), and a Packet of Industrial Commission Forms, which was admitted into the record, and marked as Stipulated Exhibit (3).
9. The issues to be determined are as follows:
 a. To what, if any, indemnity compensation is plaintiff entitled as the result of her exposure while working for defendant-employer;
 b. Whether plaintiff is entitled to have past medical bills and ongoing medical treatment paid for injuries sustained as the result of her exposure arising out of and in the course of her employment with defendant-employer;
 c. Whether plaintiff has produced sufficient evidence that her job with defendant-employer exposed her to an increased risk of developing her alleged occupational disease and that it was a significant contributing factor to her contracting said disease;
 d. Whether plaintiff has proven any degree of disability and if so, to what extent;
 e. Whether plaintiff constructively refused suitable employment despite her exposures and whether the provisions of Seagraves v. The Austin Company of Greensboro are applicable to this case; and
 f. Whether defendants are entitled to a credit for unemployment compensation benefits received by plaintiff.
 * * * * * * * * * * *
Based upon all the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-six years of age. Plaintiff is a high school graduate and had some additional training in customer service care through Coastal Community College.
2. Following high school, plaintiff worked as a cashier for Roses Stores for five years, and for Food Lion for approximately six months. After leaving her employment with Food Lion, plaintiff worked as a head security guard with Security Forces. Plaintiff then worked for Ithaca hosiery mill in Robbins, North Carolina in the packing department. This job with Ithaca was followed by a six-month period of employment with ATT in Jacksonville, North Carolina as a telemarketer. Thereafter, on October 23, 1998, plaintiff began working for defendant-employer. Defendant-employer is engaged in the retail sale of footwear and related accessories. Defendant-employer has two divisions that operate autonomously: one called the Shoe Show Division, and the other called The Shoe Department Division.
3. Plaintiff was employed by defendant-employer to work at Store No. 440 in the Jacksonville Mall, which was called The Shoe Department. Plaintiff initially worked as a part-time employee, but after a few months she was promoted to the position of "key holder," which is essentially a non-manager supervisor. Approximately two and one-half years later, plaintiff was promoted to the Store Manager of Store No. 440, and held that position until her employment with defendant-employer terminated.
4. Within the structure of defendant-employer's business, a store manager reports directly to a district supervisor, who reports to a regional director of operations. The regional director of operations then reports to the director of store operations who, in turn, reports to the president and chief executive officer of the company. Mr. Jay W. Manning is an upper level manager who is in charge of human resources and workers' compensation. In this capacity, it was Mr. Manning's responsibility to address employee complaints.
5. Plaintiff contends that she could smell an odor at her store the day she interviewed for her initial position with defendant-employer. As for her mold-related symptoms, on some documents, plaintiff contends that her symptoms began as soon as her employment with defendant-employer began in 1998. However, other documents, including her Industrial Commission Form 18, (Notice of Accident to Employer and Claim of Employee, Representative, or Dependent for Workers' Compensation Benefits) suggest that plaintiff's exposure and symptoms began in October 2001. As a store manager, plaintiff had the authority to transmit complaints to the appropriate personnel in defendant-employer's home office, including Mr. Manning. However, plaintiff's first written notification to defendants of her alleged work-related mold problems was just prior to June 17, 2002.
6. When Mr. Manning was made aware of a potential problem at plaintiff's store, he began an investigation, with his concerns including the possibility of losing business if there were a bad odor in the store. Defendant-employer also regularly monitors and inspects its stores through visits from district supervisors. Because plaintiff's compensation was based in part on her store's performance, the Full Commission finds defendants' contention, that plaintiff would have reported any significant problem that may have affected her income earlier, to be reasonable.
7. In July and August 2002, defendants retained the services of the Workplace Group to perform an industrial hygiene study and indoor environmental quality evaluation of plaintiff's store. This evaluation included a detailed report regarding the indoor air quality at the store, and a review of plaintiff's medical records and industrial hygiene studies by Dr. Bruce A. Dalton, a board certified physician in occupational and environmental medicine. Workplace Group's report was completed on September 3, 2002, and revealed similar mold counts in the indoor air at plaintiff's store as were found in the outside air.
8. Based on his review of the environmental studies and report, Dr. Dalton opined that plaintiff's exposure to the mold in her store resulted in a brief illness. Dr. Dalton is also of the opinion that there was no evidence that plaintiff or any other worker at the store developed a true allergy to molds, and that there was no indication that plaintiff would develop any chronic symptoms. Dr. Dalton further noted that plaintiff's abdominal pain, nausea and diarrhea are not generally associated with air-born exposure to molds and he was unable to associate these symptoms with work-related exposure to molds.
9. Dr. Dalton's report was redacted for purposes of HIPAA (Health Insurance Portability and Accountability Act) and to protect the identities of other employees. Notwithstanding this redaction, plaintiff's testimony that other persons have complained of allergy problems is given little, if any weight since there is no pending litigation or ongoing workers' compensation issues involving other employees for alleged mold exposure.
10. In his deposition testimony, Dr. Dalton opined that plaintiff's employment with defendant-employer did not expose her to an increased risk of developing any disease or allergy condition that she may now have. Dr. Dalton further opined that plaintiff's employment with defendant-employer did not cause or significantly contribute to any disease or allergy condition that she may now have.
11. On September 12, 2002, plaintiff was evaluated by Dr. Alex Tse, a specialist in pediatrics, with an interest in the treatment of allergies. At that time, plaintiff reported experiencing headaches and a cough. Although he did not detect anything abnormal, Dr. Tse did note that plaintiff should possibly change jobs if her symptoms were to increase at work. Plaintiff returned to Dr. Tse in October 2002, at which time she reported experiencing chest pain, coughing, a stuffy nose, and headaches. For her symptoms, Dr. Tse prescribed medications, and recommended that she wear a mask at work.
12. In November 2002, plaintiff returned to Dr. Tse's office, and was examined by a nurse practitioner who noted that plaintiff continued to experience coughing, sneezing and problems with her ears. At her December 2002 appointment with Dr. Tse, plaintiff reported experiencing shortness of breath at work only. At that time, Dr. Tse diagnosed plaintiff as having reactive airway disease and allergies. In January 2003, Dr. Tse referred plaintiff to Dr. William J. Yount, a professor of medicine, microbiology and immunology at the University of North Carolina School of Medicine. Dr. Yount was stipulated to be an expert in the field of internal medicine, allergy and immunology and rheumatology.
13. At plaintiff's initial examination, Dr. Yount completed an extensive intake questionnaire, and noted her claim of molds being present at her place of work. Dr. Yount also noted the identified substances were quite common in the environment. Diagnostic tests performed by Dr. Yount revealed negative results for plaintiff for the two molds that had been the cause of her brief illness. This testing also revealed that plaintiff was more reactive to various other substances such as purified dust mite and crude house dust than these molds. Dr. Yount opined that to the extent plaintiff were to have an allergy involving the work environment; he would suspect that allergy to resolve itself when she removed herself from that environment. Additionally, Dr. Yount testified that he had not seen an industrial hygiene study but that it would be important to see such a study before rendering a causation opinion.
14. Because Dr. Yount and Dr. Tse did not have the opportunity to review industrial hygiene data, the Full Commission gives greater weight to the opinion of Dr. Dalton.
15. Based upon the totality of the credible evidence of record, plaintiff has failed to prove that her employment with defendant-employer exposed her to an increased risk of developing any disease or allergy condition that she may now have. Additionally, plaintiff has failed to prove that her employment with defendant-employer caused or significantly contributed to any disease or allergy condition that she may now have.
16. In September 2003, two new supervisors came to visit plaintiff's store and found problems with the store's condition and with plaintiff's compliance with company policies and procedures. Following this visit, Mr. Rob Harrell and Mr. Karim Bashir assumed supervisory roles over plaintiff at her store. When plaintiff received a lower grade on her review than she had expected, she contacted another store manager in Fayetteville, Ms. Tiffany Hudson-Cone. Although both plaintiff and Ms. Hudson-Cone expressed general concern regarding defendant-employer's new managers, plaintiff further expressed her intent to resign and that she was going to encourage her staff to resign. Plaintiff also encouraged Ms. Hudson-Cone, and other managers to resign without giving notice. Additionally, plaintiff suggested that she would like this to occur the day after Thanksgiving, so that defendant-employer would sustain a significant financial loss. The relevant substance of plaintiff's conversation with Ms. Hudson-Cone was corroborated by the testimony of Mr. Joseph Scott, a traveling manager based in New Bern.
17. At the time of the initial visit by Mr. Harrell and Mr. Bashir, plaintiff's job was not in jeopardy, even though some deficiencies had been found. Also, defendant-employer arranged at that time for Mr. Scott to come assist plaintiff in improving her store. It is important to note that at the time of their store visit, Mr. Harrell and Mr. Bashir had no knowledge of plaintiff's prior allegations regarding mold exposure or any pending claim for workers' compensation benefits due to their new status with the company. Once Mr. Manning learned of plaintiff's plans, an investigation began. Following this investigation, plaintiff was terminated in October 2003.
18. Based upon the totality of the credible evidence of record, defendants have proven that plaintiff's termination was for misconduct or fault for which a non-disabled employee would also have been terminated. Accordingly, plaintiff constructively refused suitable employment as of the date of her termination.
19. Although plaintiff had filed an incident report of her illness and on September 25, 2002, through counsel, filed an Industrial Commission Form 18 (Notice of Accident to Employer), defendants did not file a Form 19 (Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission) as required by the Workers' Compensation Act and Workers' Compensation Rules of the North Carolina Industrial Commission. Further, although defendants denied plaintiff further medical treatment, they failed to file a Form 61 in compliance with Rule 601 of the Workers' Compensation Rules of the North Carolina Industrial Commission.
 * * * * * * * * * * *
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An occupational disease is defined as any disease "which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of employment." N.C. Gen. Stat. § 97-53(13).
2. Three elements are necessary to show the existence of a compensable occupational disease: "(1) the disease must be characteristic of persons engaged in a particular trade or occupation in which the plaintiff is engaged; (2) the disease must not be an ordinary disease of life to which the public is equally exposed; and (3) there must be a causal connection between the disease and the plaintiff's employment." Jarvis v.Food Lion, 134 N.C. App. 363, 367, 517 S.E.2d 388, 391 (1999), citing Hansel v. Sherman Textiles, 304 N.C. 44, 283 S.E.2d 101
(1981).
3. A disease is characteristic of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979). Plaintiff has failed to show that her employment with defendant-employer exposed her to an increased risk of developing any disease or allergy condition that she may now have. Therefore, plaintiff does not have an occupational disease that was due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13); Bookerv. Medical Center, supra.
4. Where plaintiff does not prove that her particular employment conditions placed her at a greater risk than the general public of contracting a disease, plaintiff is not entitled to compensation under N.C. Gen. Stat. §§ 97-2(9); 97-25.
5. Plaintiff's termination from employment in October 2003 with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination constitutes a constructive refusal to perform the work provided. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996); N.C. Gen. Stat. § 97-32.
6. In that defendants failed to file an Industrial Commission Form 19 (Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission) and a Form 61 (Denial ofWorkers' Compensation Claim), and in that they have failed to provide any reason for these omissions, they did not comply with the Workers' Compensation Act or Industrial Commission Rules and are subject to sanctions. Accordingly, sanctions in the amount of $500 for each violation are hereby assessed against them, totaling $1000. N.C. Gen. Stat. § 97-18; Rules 103 and 802 of the Workers' Compensation Rules of the North Carolina Industrial Commission.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiff's claim for compensation must be, and is, hereby denied.
2. Defendants shall pay sanctions in the amount of $1,000.00 to the Industrial Commission.
3. Each party shall bear its own costs of this proceeding.
This the __ day of _____________ 2006.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ THOMAS J. BOLCH COMMISSIONER